**ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED**

**Nos. 18-1063, 18-1078**

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

DUQUESNE UNIVERSITY OF THE HOLY SPIRIT,

*Petitioner*,

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent*,

————————————

UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ALLIED-INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC,

*Intervenor*.

————————————

On Petition for Review of an Order of the National Labor Relations Board,
No. NLRB-06CA197492

————————————

**BRIEF FOR AMICUS CURIAE ASSOCIATION OF CATHOLIC COLLEGES AND UNIVERSITIES IN SUPPORT OF PETITIONER**

————————————

PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
KASDIN M. MITCHELL
LAUREN N. BEEBE
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC 20005
(202) 879-5000
paul.clement@kirkland.com

*Counsel for Amicus Curiae*

July 5, 2018

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the Association of Catholic Colleges and Universities certifies that it is a non-profit organization that does not have a parent corporation or any stock.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici.

All parties, intervenors, and amici appearing before the District Court and this Court are listed in the Brief for Petitioner.

### B.    Ruling Under Review.

Petitioner has petitioned for review of the February 28, 2018, Decision and Order of the NLRB in NLRB Case No. 06-CA-197492 ("Order").  The Order is reported at 366 NLRB No. 27.   That Order was based on an underlying representation case, No. 06-RC-080933.  The Board's April 10, 2017 Decision on Review and Order in the underlying representation case is unreported but is available at 2017 WL 1330294.

### C.    Related Cases.

The NLRB filed a cross-application for enforcement of the Order, No. 18-1078, which this Court, on its own motion, consolidated with this case.

July 5, 2018

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC 20005
(202) 879-5000
paul.clement@kirkland.com

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES.............. ii

    A.    Parties and Amici.................................................................... ii

    B.    Ruling Under Review .......................................................... ii

    C.    Related Cases ....................................................................... ii

TABLE OF AUTHORITIES.................................................................... iv

GLOSSARY OF ABBREVIATIONS ..................................................... vii

STATEMENT OF INTEREST.................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 2

ARGUMENT ............................................................................................ 4

I.    This Appeal Concerns Freedom Of Religion And The Proper Scope Of Government Authority, Not The Natural Rights Of Workers .................. 4

II.    The *Pacific Lutheran* Test Creates The Same Constitutional Problems That This Court Has Already Construed The NLRA To Avoid.................................................................................................. 6

III.    The *Pacific Lutheran* Test Invites Government Officials To Impose Their Views of What Religious Education "Is" Or "Should Be".................. 15

CONCLUSION ...................................................................................... 23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

**Cases**

*Ams. United for Separation of Church & State*
  *v. Prison Fellowship Ministries, Inc.*,
  509 F.3d 406 (8th Cir. 2007) .................................................................14

*Cantwell v. Connecticut*,
  310 U.S. 296 (1940) ..............................................................................14

*\*Carroll Coll., Inc. v. NLRB*,
  558 F.3d 568 (D.C. Cir. 2009) ............................................... 2, 8, 9, 10

*Catholic Bishop of Chi. v. NLRB*,
  559 F.2d 1112 (7th Cir. 1977) ..............................................................5

*Catholic Charities of Diocese of Albany v. Serio*,
  808 N.Y.S.2d 447 (N.Y. App. Div. 2006) ...........................................14

*Colo. Christian Univ. v. Weaver*,
  534 F.3d 1245 (10th Cir. 2008)..................................................... 14, 22

*Corp. of the Presiding Bishop of the*
  *Church of Jesus Christ of Latter-Day Saints v. Amos*,
  483 U.S. 327 (1987)...............................................................................15

*Espinosa v. Rusk*,
  634 F.2d 477 (2d Cir. 1980) ..................................................................14

*Hernandez v. Comm'r*,
  490 U.S. 680 (1989)...............................................................................13

*Holy Spirit Ass'n for Unification of World Christianity*
  *v. Tax Comm'n of City of N.Y.*,
  435 N.E.2d 662 (N.Y. 1982) .................................................................14

*In re Univ. of Great Falls*,
  331 NLRB No. 188 (2000) .....................................................................7

---

[*] Authorities on which this brief chiefly relies are marked with an asterisk.

*Mitchell v. Helms*,
    530 U.S. 793 (2000)....................................................................... 13, 14

*Montrose Christian Sch. Corp. v. Walsh*,
    770 A.2d 111 (Md. 2001) ...............................................................14

*New York v. Cathedral Acad.*,
    434 U.S. 125 (1977).......................................................................14

*\*NLRB v. Catholic Bishop of Chi.*,
    440 U.S. 490 (1979)....................................................................2, 7, 11

*\*Pac. Lutheran Univ.*,
    361 NLRB No. 157 (2014) ......................................2, 3, 9, 11, 12, 14

*Serbian E. Orthodox Diocese v. Milivojevich*,
    426 U.S. 696 (1976).....................................................................5, 22

*\*Univ. of Great Falls v. NLRB*,
    278 F.3d 1335 (D.C. Cir. 2002) ..........................2, 3, 6, 8, 10, 12, 13, 15, 19, 22

*Universidad Cent. de Bayamon v. NLRB*,
    793 F.2d 383 (1st Cir. 1985) ...........................................................13

*Watson v. Jones*,
    80 U.S. 679 (1871)........................................................................22

**Other Authorities**

Committee on Nonprofit Corporations, American Bar Association,
    *Guidebook for Directors of Nonprofit Corporations* (2d ed. 2002) ..................17

Duquesne Univ. of the Holy Spirit's Request for Rev. of the Reg.
    Director's Decision and Rec. to Overrule Objection to Election and
    Issue Certification, NLRB Case No. 06-RC-080933
    (June 19, 2015)...................................................................... 12, 20, 21

Philip Gleason, *Contending With Modernity:*
    *Catholic Higher Education in the Twentieth Century* (1995) ...........................15

Douglas Laycock, *Towards a General Theory of the Religion Clauses:*
    *The Case of Church Labor Relations and the Right to Church*
    *Autonomy*, 81 Colum. L. Rev. 1373 (1981)......................... 4, 5, 6, 20

Pontifical Council for Justice and Peace,
   *Compendium of the Social Doctrine of the Church* (2004) ..................................4

Pope John Paul II, *Apostolic Constitution Ex Corde Ecclesiae* (1990),
   https://bit.ly/1PrbdQh ...................................................................... 16, 18, 19, 20

Regional Director's Decision & Recommendation to Overrule
   Objection to Election & Issue Certification,
   NLRB Case No. 06-RC-080933 (June 5, 2015)...........................................11, 13

Southern Association of Colleges and Schools, Commission on
   Colleges, *The Principles of Accreditation: Foundations for Quality
   Enhancement* (2010 ed.), https://bit.ly/2tSa6ZG .................................................17

Laurence Tribe, *Disentangling Symmetries: Speech, Association,
   Parenthood*, 28 Pepp. L. Rev. 641 (2001) ..........................................................19

United States Conference of Catholic Bishops,
   *Ex Corde Ecclesiae: The Application to the United States* (2000),
   https://bit.ly/2IRCTlB .................................................................... 16, 17, 19, 20

# GLOSSARY OF ABBREVIATIONS

| Abbreviation | Definition |
| --- | --- |
| ACCU | Association of Catholic Colleges and Universities |
| NLRB | National Labor Relations Board |
| NLRA | National Labor Relations Act |

## STATEMENT OF INTEREST[1]

The Association of Catholic Colleges and Universities ("ACCU"), founded in 1899, is the collective voice of Catholic higher education in the United States. ACCU represents 194 accredited Catholic institutions of higher learning in the United States, including Duquesne University of the Holy Spirit. ACCU's membership comprises 80 percent of accredited, degree-granting Catholic institutions of higher learning in the United States. ACCU's mission focuses on strengthening the mission and character of Catholic higher education, and ACCU is often involved in educating the general public on issues relating to Catholic education. Amici thus have a significant interest in the issues raised by the Board's jurisdictional test as applied to religious education in the United States.

---

[1] This brief is filed pursuant to this Court's Rule 29. A party's counsel did not author this brief in whole or in part, and no party other than *amici* contributed any money to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(c)(5). Counsel of record for all parties have consented to this filing.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This Court has twice squarely rejected the persistent efforts of the National Labor Relations Board to exercise jurisdiction over religiously affiliated schools. *See Univ. of Great Falls v. NLRB*, 278 F.3d 1335 (D.C. Cir. 2002); *Carroll Coll., Inc. v. NLRB*, 558 F.3d 568 (D.C. Cir. 2009). The third time should not be the charm for the Board. As the Supreme Court made crystal clear nearly 40 years ago, there is "no escape from conflicts flowing from the Board's exercise of jurisdiction over teachers in church-operated schools and the consequent serious First Amendment questions that would follow." *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 504 (1979). The Board's latest effort only underscores the wisdom of the Supreme Court's observation and certainly provides no basis for a different result.

Having been repeatedly admonished that it lacks the power to decide whether a school is "sufficiently religious" to fall outside its jurisdiction, the Board has tried again by focusing on a school's *faculty members* and asking whether the school holds them out to the public "as performing a specific role in creating or maintaining the university's religious purpose or mission." *Pac. Lutheran Univ.*, 361 NLRB No. 157, at *11 (2014). But that test "involve[s] just 'the sort of intrusive inquiry that *Catholic Bishop* sought to avoid,' with 'the NLRB trolling through the beliefs of schools, making determinations about their religious mission, and that mission's centrality to the "primary purpose" of the school.'" *Carroll College*, 558 F.3d at 572

2

(brackets omitted) (quoting *Great Falls*, 278 F.3d at 1341-42). Indeed, the very notion that the Board can decide which faculty members do and do not advance a "school's religious purpose or mission" is fundamentally incompatible with the Board's limited focus and expertise, not to mention this Court's repeated admonishments that the Board does not get to decide what is or is not part of a "school's religious purpose or mission."

The Board's *Pacific Lutheran* test aptly illustrates this problem. According to the Board, faculty advance a "school's religious purpose or mission" only through activities that are overtly and unmistakably religious in character—*i.e.*, "integrating the institution's religious teachings into coursework, serving as religious advisors to students, propagating religious tenets, or engaging in religious indoctrination or religious training." 361 NLRB No. 157 at *12. That cramped conception of a religious mission is simply not how religious education works. As the Catholic experience vividly illustrates, *everything* a religious school does—even things may appear "secular" to the untrained eye—is designed to advance the school's "religious purpose or mission." By attempting to draw its own line between the secular and the sacred, the Board's test thus inevitably claims the power to make precisely the types of sensitive religious determinations that the Constitution declares off limits to government.

To be clear, this case is about the Board's jurisdiction, not about the natural rights of employees. The Catholic Church supports the moral right of workers to organize and bargain collectively, and Catholic colleges and universities support that teaching. But the First Amendment protects the right of Catholic colleges and universities to pursue those goals without excessive government entanglement. By attempting to assert jurisdiction over the relationship between a religious institution and its faculty, the Board's test created and will inevitably continue to create exactly the kinds of constitutional problems that this Court has construed the NLRA to avoid.

## ARGUMENT

### I.  This Appeal Concerns Freedom Of Religion And The Proper Scope Of Government Authority, Not The Natural Rights Of Workers.

To make explicit what should be obvious: This case is not about the natural rights of employees. It is about whether the Board has the power to interfere with the relationship between a Catholic school and its faculty. The Catholic Church has "long supported the moral right of workers to organize and bargain collectively, and the moral duty of employers to bargain." Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 Colum. L. Rev. 1373, 1398 (1981); *see, e.g.*, Pontifical Council for Justice and Peace, *Compendium of the Social Doctrine of the Church* §305 (2004) ("The Magisterium recognizes the fundamental role played by labour unions, whose existence is connected with the right to form associations or unions

4

to defend the vital interests of workers employed in the various professions."). Catholic colleges and universities respect and support the Church's teaching on human work.

Support for the moral rights of workers does not, however, require support for *government control* over labor decisions, especially those decisions that are intimately connected to an educational institution's religious mission. To the contrary, the First Amendment shields religious institutions from state interference in the establishment of "their own rules and regulations for internal discipline and government." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 724 (1976). "Even if government policy and church doctrine endorse the same broad goal, the church has a legitimate claim to autonomy in the elaboration and pursuit of that goal." Laycock, *supra*, at 1399. Thus, any law that "tak[es] the power to decide a matter away from the church and either prescrib[es] a particular decision or vest[s] it elsewhere—in the executive, a court, an agency, an arbitrator, or a union"—"takes away not only a decision of general policy when it is imposed, but many more decisions of implementation when it is enforced." *Id.*

These concerns are particularly acute in the context of higher education, where bargaining over employment terms inevitably "transmutat[es]" into bargaining over the relationship between faith and academic policy. *Catholic Bishop of Chi. v. NLRB*, 559 F.2d 1112, 1123 (7th Cir. 1977), *aff'd*, 440 U.S. 490 (1979). Government

superintendence of a religious institution's labor policies will necessarily, even if unintentionally, lead to government control over "the very process of forming the religion as it will exist in the future."  Laycock, *supra*, at 1391.  The Constitution does not tolerate that sort of intrusion into the religious freedom of religious organizations.

## II.    The *Pacific Lutheran* Test Creates The Same Constitutional Problems That This Court Has Already Construed The NLRA To Avoid.

The test the Board invoked to justify its jurisdiction here entails exactly the same kind of constitutionally problematic government intrusion into religion that this Court has already—repeatedly—construed the NLRA to avoid.  Just like the "substantial religious character test" that this Court rejected in *Great Falls*, the two-prong test that the Board set forth in *Pacific Lutheran* ultimately "boils down to" one question:  "[I]s [this university] *sufficiently* religious?"  *Great Falls*, 278 F.3d at 1343.  That is precisely the question that both the Supreme Court and this Court have repeatedly told the Board it has no business asking.  Simply put, the NLRA does not empower the Board to "troll[] through the beliefs" of religious universities and claim jurisdiction over those that it deems not religious enough.  *Id.* at 1342.  The Board cannot get around that constraint by shifting its focus to whether the school's faculty, rather than the school itself, is "sufficiently religious."

That is clear from the Supreme Court's decision in *Catholic Bishop*.  That case involved the Board's first effort to impose a "sufficiently religious" test, under which

it attempted to claim jurisdiction over religious schools unless it found them "completely religious, not just religiously associated." 440 U.S. at 498. The Supreme Court squarely rejected that approach, explaining that the "very process" of sorting "completely religious" institutions from those deemed merely "religiously associated" raised "serious constitutional questions" under the Religion Clauses. *Id.* at 501-02. Finding no "clear expression of Congress' intent to" engender such constitutional difficulties, the Court "decline[d] to construe the Act in a manner that could, in turn, call upon the Court to resolve difficult and sensitive questions arising out of the guarantees of the First Amendment Religion Clauses." *Id.* at 507. Instead, the Court concluded that the NLRA does not "bring teachers in church-operated schools within the jurisdiction of the Board." *Id.*

Undeterred, the Board continued to claim the power to regulate religious schools, claiming in the second iteration of its jurisdictional assertion that it had oversight authority over any religious school that it found lacked a "substantial religious character." *In re Univ. of Great Falls*, 331 NLRB No. 188, at*4-6 (2000). In its view, only schools that could satisfy this test fell outside its statutory jurisdiction as construed by *Catholic Bishop*. This Court squarely rejected the Board's second effort to assert authority and classify schools based on their "religious character." As the Court explained, the Board's "substantial religious character" test allowed the Board to engage in "the *exact* kind of questioning into

religious matters which *Catholic Bishop* specifically sought to avoid." *Great Falls*, 278 F.3d at 1343. The Court therefore instructed the Board to consider, at most, only three objective factors in determining "whether an entity is altogether exempt from the NLRA": whether the school "(a) holds itself out to students, faculty and community as providing a religious educational environment; (b) is organized as a nonprofit; and (c) is affiliated with, or owned, operated, or controlled, directly or indirectly, by a recognized religious organization, or with an entity, membership of which is determined, at least in part, with reference to religion." *Id.* (citations and quotations marks omitted). As the Court explained, this "bright-line test" would "allow the Board to determine whether it has jurisdiction without delving into matters of religious doctrine or motive." *Id.* at 1345.

Seven years later, the Board tried again, this time ordering Presbyterian-affiliated "Carroll College to bargain with the recognized collective bargaining agent of its faculty." *Carroll Coll.*, 558 F.3d at 570. According to the Board, Carroll College was not exempt under *Catholic Bishop* and *Great Falls* because its religious principles were only "aspirational," and "because 'the Church does not sponsor the College, does not own its campus, and does not have any right of ultimate control over it.'" *Id.* at 574. Yet again, this Court concluded that the Board's "analysis require[d] too much," and was "tantamount to questioning the sincerity of the school's public representations about the significance of its religious affiliation." *Id.*

8

at 573, 574.  The Court reiterated that the Board should look "solely" at the school's "public representations as to its religious educational environment," rather than "conducting a skeptical inquiry into the actual influence exerted over the school by its affiliated religious institution."  *Id.* at 573.  Anything more, the Court concluded, "neither the Board nor [the Court] may do."  *Id.*

Remarkably, after all that, the Board still refuses to take no for an answer.  The Board has now squarely *rejected* the approach that this Court found the NLRA compels, and instead supplanted it with a test that suffers from all the same problems that this Court has repeatedly construed the NLRA to avoid.  According to the Board, it is not enough that a school is religiously affiliated and "holds itself out as providing a religious education environment." *Pac. Lutheran*, 361 NLRB No. 157, at *1.  Instead, the school must also prove, through "substantial evidence" no less, that it "holds out" the particular *faculty members* who seek to invoke the Board's jurisdiction "as performing a specific role in creating or maintaining the school's religious purpose or mission"—*i.e.*, "as performing a *specific religious function*." *Id.* at *1, *11.  In other words, the Board has taken the same "sufficiently religious" test that this Court rejected in *Great Falls* and *Carroll College*, and just applied it at the faculty level instead of at the institution level.  *See* 361 NLRB No. 157 (Member Johnson, dissenting).

That approach is impossible to reconcile with this Court's precedents.  This Court made crystal clear in *Great Falls*, and again in *Carroll College*, that the point of the bright-line test it set forth is to determine whether the Board has jurisdiction over *the institution*.  If it does not, then that is the end of the analysis.  The Board does not retain some residual jurisdiction to inquire whether there are pockets of faculty at the institution that can still be regulated by the Board.  No jurisdiction means no jurisdiction.  And the inapplicability of the NLRA to the institution means the institution "is altogether exempt from the NLRA," and thus cannot be forced to bargain with *any* of its faculty members.  *Great Falls*, 278 F.3d at 1347.  That is precisely why this Court found no need to "address Carroll's argument that its faculty members [were] managerial employees who f[e]ll outside the protection of the NLRA."  *Carroll Coll.*, 558 F.3d at 575.  Because Carroll College itself was "exempt from the NLRB's jurisdiction," *id.*, the Board could not assert jurisdiction over its faculty members, managerial or not.

Here, too, it is undisputed that Duquesne satisfies the bright-line test that this Court created, as it unquestionably holds itself out as religious, is non-profit, and is religiously affiliated.  That should have been the end of the inquiry.  Instead, invoking its newly minted *Pacific Lutheran* two-part test, the Board embarked on a searching examination of whether the relevant Duquesne "faculty members are required to integrate the institution's religious tenets into coursework, serve as

religious advisors to students, propagate those tenets, engage in religious training, or conform to the tenets in a manner specifically linked to their job duties." Regional Director's Decision & Recommendation to Overrule Objection to Election & Issue Certification, NLRB Case No. 06-RC-080933, at 9 (June 5, 2015) ("Reg. Dir.'s Decision"). In the Board's view, only if faculty members are held out as having that kind of overtly and identifiably "religious" function—as opposed to serving in the kind of role that exists "at virtually all universities"—can they be understood to play a "role in creating or maintaining the university's religious purpose or mission." *Pac. Lutheran*, 361 NLRB No. 157, at *11.

That approach repeats all the same mistakes that both this Court and the Supreme Court have corrected before. The whole point of *Catholic Bishop*, *Great Falls*, and *Carroll College* is that the Board has no business deciding what is and is not "sufficiently religious," as "the very process of" "inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the schools' religious mission" is incompatible with the Constitution. *Catholic Bishop*, 440 U.S. at 502. Yet the Board's *Pacific Lutheran* test engages in precisely that forbidden inquiry, deeming a school's "religious purpose or mission" advanced only by those things that the Board itself considers "religious"—*i.e.*, "integrating the institution's religious teachings into coursework, serving as religious advisors to students, propagating religious tenets, or engaging in religious indoctrination or religious

11

training."  361 NLRB No. 157, at *12.  But as this Court has made clear—repeatedly—the Board simply does not have the power to decide what does and does not advance a school's "religious purpose or mission," as any such inquiry will inevitably reduce to "delving into matters of religious doctrine."  *Great Falls*, 278 F.3d at 1345.

While the Board seemed to think it could avoid these problems by focusing on "whether *a reasonable prospective applicant* would conclude that performance of [the] faculty responsibilities [in question] would require furtherance of the college or university's religious mission," *Pac. Lutheran*, 361 NLRB No. 157, at *13 (emphasis added), that only makes matters worse, as it just underscores that the Board's test renders the school's *own* views about the scope of its religious mission irrelevant.  That is no exaggeration:  The Regional Director *refused* to consider evidence of how Duquesne understood the expectations and obligations of its faculty.  *See, e.g.*, Duquesne Univ. of the Holy Spirit's Request for Rev. of the Reg. Director's Decision and Rec. to Overrule Objection to Election and Issue Certification, NLRB Case No. 06-RC-080933, at 47 (June 19, 2015) ("*RFR*") (noting that the chief academic officer's interpretation of the faculty handbook had been ruled inadmissible).  Indeed, the Regional Director even dismissed evidence that Duquesne's *public representations* charge faculty "with certain [religious] responsibilities," on the theory that adjunct faculty members are not "personally

12

informed" of those responsibilities.  Reg. Dir.'s Decision at 10-11.  In short, what the school itself considers core to its religious mission simply did not matter.

The Board's test thus "delv[es] into matters of religious doctrine," *Great Falls*, 278 F.3d at 1345, in a manner that "is not only unnecessary but also offensive." *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality opinion).  Just as troubling, it is bound to lead to additional constitutional problems down the road.  As then-Judge Breyer explained, "'mandatory subjects of bargaining' … in the context of 'educational institutions' may concern the whole of school life." *Universidad Cent. de Bayamon v. NLRB*, 793 F.2d 383, 401-02 (1st Cir. 1985) (en banc) (opinion of Breyer, J.); *see also Catholic Bishop*, 440 U.S. at 502-03.  Allowing the Board to insert itself into such sensitive areas as mission-related hiring criteria, disciplinary actions, and healthcare benefits would run counter to the whole thrust of the Religious Clauses.

In short, the Board's newly minted "specific religious function" test runs headlong into the First Amendment problems that *Catholic Bishop*, *Great Falls*, and *Carroll College* construed the NLRA to avoid.  Time and again, courts across the country have reiterated that the government must refrain from "trolling through a[n] … institution's religious beliefs." *Mitchell*, 530 U.S. at 828 (plurality opinion).[2]  By

---

[2] *See, e.g.*, *Hernandez v. Comm'r*, 490 U.S. 680, 694 (1989) ("'pervasive monitoring' for 'the subtle or overt presence of religious matter' is a central danger against which we have held the Establishment Clause guards"); *New York v.*

claiming the power to decide for itself what is and is not essential to "creating or

maintaining the school's religious purpose or mission," *Pac. Lutheran*, 361 NLRB

No. 157, at *1, the *Pacific Lutheran* test does exactly that.

---

*Cathedral Acad.*, 434 U.S. 125, 133 (1977) (government determination of "what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment"); *Cantwell v. Connecticut*, 310 U.S. 296, 307 (1940) (striking down statute that conditioned availability of solicitation licenses on "a determination by state authority as to what is a religious cause"); *Ams. United for Separation of Church & State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406, 414 n.2 (8th Cir. 2007) ("An inquiry into an organization's religious views to determine if it is pervasively sectarian 'is not only unnecessary but also offensive.'" (quoting *Mitchell*, 530 U.S. at 828)); *Colorado Christian University v. Weaver*, 534 F.3d 1245, 1265 (10th Cir. 2008) (empowering government to distinguish "between 'indoctrination' and mere education" "threaten[s] to embroil the government in line-drawing and second-guessing regarding matters about which it has neither competence nor legitimacy"); *Catholic Charities of Diocese of Albany v. Serio*, 808 N.Y.S.2d 447, 462 (N.Y. App. Div. 2006) ("[E]xcessive entanglement between church and state may occur when the government performs an individualized inquiry into whether a particular entity's activities are religious or secular, 'because [the inquiry] involves [government] officials in the definition of what is religious.'" (second and third alterations in original) (quoting *Espinosa v. Rusk*, 634 F.2d 477, 481 (2d Cir. 1980))), *aff'd*, 7 N.Y.3d 510 (N.Y. 2006); *Montrose Christian Sch. Corp. v. Walsh*, 770 A.2d 111, 129 n.10 (Md. 2001) ("For courts to determine whether positions in religious organizations perform 'primarily' religious functions ... would involve a significant 'degree of entanglement' in the affairs of religious organizations."); *Holy Spirit Ass'n for Unification of World Christianity v. Tax Comm'n of City of N.Y.*, 435 N.E.2d 662, 665 (N.Y. 1982) ("When ... particular purposes and activities of a religious organization are claimed to be other than religious, the civil authorities may engage in but two inquiries: Does the religious organization assert that the challenged purposes and activities are religious, and is that assertion bona fide?").

III.  **The *Pacific Lutheran* Test Invites Government Officials To Impose Their Views of What Religious Education "Is" Or "Should Be."**

The Board's *Pacific Lutheran* test not only is flatly inconsistent with this Court's precedent, but also reflects a fundamentally flawed conception of what qualifies as the "religious purpose or mission" of a religious school.  *See Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 336 (1987) (cautioning "that a judge [might] not understand [an organization's] religious tenets and sense of mission").  As this Court has made clear, "[t]hat a secular university might share some goals and practices with a Catholic or other religious institution cannot render the actions of the latter any less religious." *Great Falls*, 278 F.3d at 1346.  To the contrary, as the Catholic experience vividly reflects, incorporating the "secular" into religious education can itself be a core part of a school's religious mission (or the converse).  The very notion that a school's mission can be neatly divided into "religious" and "non-religious" buckets therefore "minimize[s] the legitimacy of the beliefs expressed by a religious entity."  *Id.* at 1345.

Catholic colleges and universities in the United States have offered a broad-gauge education since their earliest days.  *See* Philip Gleason, *Contending With Modernity: Catholic Higher Education in the Twentieth Century* 4-6 (1995).  In 1990, Pope John Paul II reaffirmed that longstanding commitment and issued the Apostolic Constitution *Ex corde Ecclesiae* as the "magna carta" for Catholic higher

education around the world.  *See* Pope John Paul II, *Apostolic Constitution Ex Corde Ecclesiae* (1990) ("*Ex corde Ecclesiae*"), https://bit.ly/1PrbdQh.  The Catholic Bishops of the United States subsequently approved *The Application of Ex corde Ecclesiae for the United States* to implement *Ex corde Ecclesiae* in this country.  *See* United States Conference of Catholic Bishops, *Ex Corde Ecclesiae: The Application to the United States* (2000) ("*Application*"), https://bit.ly/2IRCTlB.  Both documents affirm Catholic colleges' and universities' commitment to the broader search for truth and to engagement with culture.  "A Catholic university," in the words of *Ex corde Ecclesiae*, "is a place of research, where scholars scrutinize reality with the methods proper to each academic discipline, and so contribute to the treasury of human knowledge."  *Ex corde Ecclesiae* ¶ 15.  Academic freedom is an "essential component" of this religious identity.  *Application* art. 2(2).  Catholic colleges and universities must therefore "take steps to ensure that all professors are accorded 'a lawful freedom of inquiry and of thought, and of freedom to express their minds humbly and courageously about those matters in which they enjoy competence.'"  *Id.*

Catholic higher education's commitment to independent inquiry is buttressed by an equally strong commitment to institutional independence.  Catholic colleges and universities must possess "that institutional autonomy necessary to perform [their] functions effectively," *Ex corde Ecclesiae* ¶ 12, and that autonomy "must be

respected and promoted by all, so that the university may effectively carry out its mission of freely searching for all truth," *Application* art. 2(1). The organizations that accredit colleges and universities, including Catholic colleges and universities, typically require accredited institutions to demonstrate that they have independent governing boards. *See, e.g.*, Southern Association of Colleges and Schools, Commission on Colleges, *The Principles of Accreditation: Foundations for Quality Enhancement* 3.2.4 (2010 ed.), https://bit.ly/2tSa6ZG (the governing board of an accredited institution must be "free from undue influence" from external bodies and must "protect[] the institution from such influence"). Moreover, because Catholic colleges and universities generally are organized as non-profit corporations under state law, their trustees are under a fiduciary obligation to exercise independent judgment and act solely in the best interest of the university. *See* Committee on Nonprofit Corporations, American Bar Association, *Guidebook for Directors of Nonprofit Corporations* 20-21 (2d ed. 2002).

This independence has allowed a great variety of institutional characteristics and missions to flourish among Catholic colleges and universities. Some institutions have many Catholic students; others have relatively few. Some are women's institutions, focusing on urban women who are the first in their families to attend college. Others are two-year colleges in rural areas serving the local population. Some are powerful, well-known research institutions contributing to the

17

understanding of the world's great social questions. Many are broad-based institutions, often serving a student body that is less wealthy than the students served by the public university in the same region.

The organizational independence and broad educational mission of many Catholic colleges and universities does not mean that the roles played by certain faculty members are not uniquely "Catholic" or "religious." Inter-faith dialogue is an essential aspect of the Catholic Church's mission to engage the world. *Ex corde Ecclesiae* ¶ 43; *see also id.* at ¶ 26 (noting that "[t]he university community of many Catholic institutions includes members of other Churches, ecclesial communities and religions, and also those who profess no religious belief"). That dialogue is mutually beneficial: It both offers the "rich experience of the Church's own culture" to the outside world and enables the Church "to come to a better knowledge of diverse cultures, discern their positive and negative aspects, to receive their authentically human contributions, and to develop means by which it can make the faith better understood by the men and women of a particular culture." *Id.* ¶¶ 43-44. Accordingly, faculty members of other faiths or no faith—whether they even acknowledge it—directly advance the Church's evangelistic witness by improving a Catholic college's or university's cultural knowledge and fostering inter-faith dialogue.

18

As this Court observed in *Great Falls*, many religious-affiliated institutions—including many Catholic colleges and universities—prefer to promote religious beliefs "with a velvet glove rather than an iron fist."  278 F.3d at 1346 (quoting Laurence Tribe, *Disentangling Symmetries: Speech, Association, Parenthood*, 28 Pepp. L. Rev. 641, 648-49 (2001)).  Religious faith and values are transmitted at such institutions by example, acculturation, and reasoned discussion, rather than by "hard-nosed proselytizing."  *Id.*; *see also Ex corde Ecclesiae* ¶ 20 ("In the communication of knowledge, emphasis is … placed on how *human reason in its reflection* opens to increasingly broader questions, and how the complete answer to them can only come from above through faith.  Furthermore, the *moral implications* that are present in each discipline are examined as an integral part of the teaching of that discipline so that the entire educative process be directed towards the whole development of the person.").  For Catholic colleges and universities, the "essential elements of Catholic identity" include a commitment to be faithful to the teachings of the Catholic Church, to adhere to Catholic ideals, principles, and attitudes in carrying out research, teaching, and all other university activities, and to create a campus culture and environment that is expressive and supportive of a Catholic way of life. *Application* pt. 1, §7.

The decision of many Catholic colleges and universities to employ non-Catholic faculty does not imply a decision to hire persons with no connection to the

19

school's religious mission.  To the contrary, it affirms the institution's commitment

to the "continuous quest for truth through … research," which is an integral part of

the Church's religious mission and is directly advanced by every faculty member.

*Ex corde Ecclesiae* ¶ 30.  As one commentator has explained:

> Not every religious school can or will insist that every teacher actively
> promote religion.  But nearly all will at least require every teacher not
> to interfere.  A religious school might hire a nonbelieving math teacher,
> but it is not likely to permit him to flaunt his nonbelief, to denigrate the
> church that runs the school, or to set a bad example. Thus, even the
> nonbelieving   math   teacher   has   some   intrinsically   religious
> responsibility.

Laycock at 1411.   The Catholic Bishops of the United States call for a

"[c]ommitment of witness of the Catholic faith by Catholic administrators and

teachers, especially those teaching on theological disciplines, and acknowledgement

and respect on the part of non-Catholic teachers and administrators of the

university's Catholic identity and mission." *Application* pt. 1, §7.

Duquesne University of the Holy Spirit shares these convictions.  Duquesne's

public statements on its website to all adjunct faculty members clearly communicate

that faculty "are a critical part of the trinity at the heart of who we are as you bring

our students an education for a lifetime in our Catholic, Spiritan tradition." *RFR* at

32.  The university explains that its faculty "serve[s] God by serving [the school's]

students."  *Id.*   Because service to God is a quintessential "specific religious

function," the Board's inquiry should have ended there.

20

But even looking beyond that, the record is replete with evidence that adjunct faculty directly assist in the delivery of a core curriculum that, taken as a whole, "uniquely expresses the Spiritan-Catholic identity of Duquesne University." *Id.* at 15-16 (citing Core Curriculum Website Page). Adjunct faculty members have taught an average of 44 percent of core credit hours over the past five years. *Id.* at 16. That is significant because every faculty member teaching in the core is expected to achieve explicitly religious student learning outcomes like "[i]dentify[ing] some of the unique perspectives provided by faith and reason in the pursuit of truth." *See id.* (first alteration in original). Indeed, even faculty who reject the Catholic faith have an intrinsic religious responsibility to refrain from undermining the University's religious mission. *Id.* at 25 (terms and conditions of faculty employment define academic freedom as "subject to the principles and values expressed in the Duquesne University Mission Statement" and require teachers to "respect the religious and ecumenical orientation of the University" (emphasis omitted)).

The Regional Director misunderstood these core aspects of Duquesne's religious education, essentially concluding that adjunct faculty have no "specific religious function" unless they teach religion. That misunderstanding was not some aberrational error, but an inevitable consequence of the misguided *Pacific Lutheran* test. By its very nature, that test invites government officials to substitute their judgment about whether a faculty member serves a "religious function" for the

21

judgment of the hiring institution and its religious community.   Government officials, however, are ill-positioned to assess the religious character of a faculty member's role at an expressly religious institution, and will far too often rely on their own conceptions of what a religious function "is" or "should be."   *See Watson v. Jones*, 80 U.S. 679, 729 (1871) ("It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of [church] bodies as the ablest men in each one in reference to their own.").

Such government "second-guessing" of a religious institution's conception of how its faculty advance its religious mission is precisely what the Religion Clauses were designed to prevent.   *Colo. Christian Univ.*, 534 F.3d at 1261; *see also Milivojevich*, 426 U.S. at 708 (a court may not "impermissibly substitute[] its own inquiry into church polity and resolutions" for the church's inquiry).   It is also precisely what this Court has construed the NLRA to avoid.   Indeed, "[t]o limit the *Catholic Bishop* exemption to religious institutions with hard-nosed proselytizing, that limit their enrollment to members of their religion, and have no academic freedom … is an unnecessarily stunted view of the law, and perhaps even itself a violation of the most basic command of the Establishment Clause—not to prefer some religions (and thereby some approaches to indoctrinating religion) to others." *Great Falls*, 278 F.3d at 1346.   Accordingly, just as it has—twice—before, this Court

should reject the Board's latest attempt to claim the power to decide for itself whether a religious institution is "sufficiently religious."

## CONCLUSION

For the reasons set forth above, this Court should vacate the Board's decision to assert jurisdiction over Duquesne University of the Holy Spirit.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
KASDIN M. MITCHELL
LAUREN N. BEEBE
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC 20005
(202) 879-5000
paul.clement@kirkland.com

*Counsel for Amicus Curiae*

July 5, 2018

23

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5,383 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

2. This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

July 5, 2018

s/Paul D. Clement
Paul D. Clement

## CERTIFICATE OF SERVICE

I hereby certify that on July 5, 2018, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Paul D. Clement</u>
Paul D. Clement